**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Christopher Witham,<br><br>*Plaintiff*,<br><br>*vs*<br><br>The Hershey Company, a Delaware corporation,<br><br>*Defendant*. | Court File No. 23-cv-1563<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Christopher Witham ("Plaintiff" or "Plaintiff Witham"), for his Complaint against Defendant The Hershey Company ("Defendant Hershey"), alleges, upon knowledge with respect to his own acts and upon information and belief with respect to all other matters, as follows:

## INTRODUCTION

1. In August 2021, Defendant Hershey mandated that all of its Corporate department employees, receive the Covid-19 vaccination as a condition of continuing their employment ("Vaccine Mandate"). Plaintiff objected to receiving the Covid-19 vaccination because of his sincerely-held religious beliefs. Plaintiff filed a request for a religious exemption with Defendant to be exempt from taking the Covid-19 vaccination. Defendant denied the requested religious exemption. In addition, Defendant failed to undertake an individual interactive process with Plaintiff as required for evaluating religious exemption requests. Defendant terminated Plaintiff's employment on January

21, 2022 stating the termination was based on Plaintiff's refusal to take the Covid-19 vaccine.

2. Plaintiff Witham's denial of his request for a religious exemption, and his subsequent termination, also followed a Senior Leader's Meeting where Defendant Hershey's Corporate Communication Director stated that Hershey had "too many old white guys" working there. Plaintiff's status as an older white male employee was an additional "motivating factor" for Defendant's termination of Plaintiff Witham.

3. Based on Defendant's implementation of the Vaccine Mandate, its refusal to grant Plaintiff's request for a religious exemption and its motivation to restrict employment of older, white males, Plaintiff brings claims under Title VII for religious, race, and sex discrimination; a claim under the Americans with Disabilities Act ("ADA"); a claim under the Age Discrimination in Employment Act ("ADEA"), and related state claims under the Minnesota Human Rights Act, as well as for breach of contract.

**JURISDICTION AND VENUE**

4. Plaintiff has fulfilled the jurisdictional requirements of Title VII of the Civil Rights Act of 1964 and the ADA, including the filing of a Charge with the EEOC, and the receipt of a right-to-sue letter from Equal Employment Opportunity Commission ("EEOC") following closure of the EEOC file, all in compliance with 42 U.S.C. §2000e-5(f)(1).

5. This Court has original subject matter jurisdiction over this case, as it raises claims pursuant to federal statute, pursuant to 28 U.S.C. §1331. This Court further has

supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

6. This Court has personal jurisdiction over Defendant Hershey as it is a Delaware corporation, also registered in and operating in the State of Minnesota.

7. Defendant Hershey is subject to the provisions of Title VII and the ADA because Defendant Hershey employs more than fifteen employees in each of twenty or more calendar weeks in the current or preceding calendar year under 42 U.S.C. §2000e (b) and 42 U.S.C. §12111 (5)(A).

8. Venue is proper in the District of Minnesota under 28 U.S.C. § 1391(e)(1) because the actions giving rise to this cause of action occurred in Minnesota, Defendant conducts business in the State of Minnesota, and during most of his employment, Plaintiff Witham resided in Minnesota.

**PARTIES**

9. Plaintiff Witham was a Minnesota resident during the majority of his employment with Hershey, and worked for Defendant Hershey at Defendant's Minneapolis location, most recently as Omnichannel Integration Lead. Plaintiff worked for Defendant Hershey for eleven and one-half years.

10. In November 2021, only two months before Defendant Hershey terminated Plaintiff Witham, Plaintiff Witham moved his residence to Star Prairie, Wisconsin. Plaintiff Witham moved his residence to Wisconsin with the knowledge, consent, and approval of Defendant Hershey.

11. Defendant Hershey is a Delaware Corporation, and is also registered in and operates facilities in Minnesota.

**FACTS**

12. During the Covid-19 pandemic, starting in June 2020 and through his termination in January 2022, Defendant Hershey asked Plaintiff to work remotely in order to prevent Plaintiff either contracting or transmitting the Covid-19 virus from or to any of Defendant's employees or customers. Plaintiff accommodated Defendant Hershey by working remotely from his residence which was first in Hennepin County, Minnesota, and then Polk County, Wisconsin.

13. Plaintiff, while unvaccinated, continued to provide his services remotely, as requested by and accepted by Defendant Hershey. Plaintiff performed his remote work from his home, located in Hennepin County, Minnesota during 2020 and most of 2021.

14. Plaintiff Witham performed the services requested of him so well that Defendant Hershey rewarded Plaintiff with a promotion to Omnichannel Integration Lead in June 2021.

15. In connection with his duties as the Omnichannel Integration Lead position, Plaintiff Witham was not requested to travel to customer locations, to meet with other people in person, or to travel to corporate headquarters. As a result, Plaintiff was never in close proximity to any of Defendant's employees or customers such that Plaintiff could transmit the Covid-19 virus to any of Defendant's employees or customers.

16. Because Defendant insisted that Plaintiff work from his home, Plaintiff sought the approval of Defendant for Plaintiff to move his residence from Minnesota to

Wisconsin. Plaintiff Witham sought permission from his supervisor, Mr. David Nolen, to move Plaintiff's residence to Wisconsin. Mr. Nolen informed Plaintiff that Hershey would support Mr. Witham's continuing to work remotely and therefore supported Plaintiff's move from Minnesota to Wisconsin. Plaintiff thus made the move to Wisconsin *in reliance* on Hershey's representations that he could continue to work remotely.

17. When Covid-19 vaccines first became available in December 2020 Defendant encouraged, but did not require its employees to get vaccinated. Plaintiff continued to work remotely for Defendant throughout 2020, 2021, and into 2022 while unvaccinated pursuant to Defendant's request and permission.

18. When Defendant decided to implement a Vaccine Mandate in August 2021 for *some* of its employees. Defendant Hershey announced it would be implementing the Vaccine Mandate for Defendant's U.S. Corporate and Commercial ("Corporate") employees, only. Defendant's Manufacturing division ("Manufacturing"), Retail Sales division ("Retail") employees, and International employees were not required to be vaccinated.

19. Defendant's Corporate department included less than one-third of Hershey's employees. Hershey's Vaccine Mandate targeting the Corporate division, was the division that also had the highest rate of voluntary vaccination, and thus the lowest need for forced vaccination.

20. While Hershey's mandated the vaccine for the Corporate department, Defendant Hershey allowed its Manufacturing department to vote on whether to have a

vaccine mandate. Hershey's Manufacturing department opted not to implement a Vaccine Mandate "due to '**overwhelmingly low support among employees**.'"

21. Defendant Hershey has provided no explanation why, if the Vaccine Mandate was a benefit to the company and its Corporate workers, those positive benefits were not similarly bestowed upon the employees of the Retail, Manufacturing, and International divisions.

22. Defendant Hershey thus openly discriminates between its *Corporate employees* such as Mr. Witham, and the *Retail, Manufacturing and International employees.* The Retail and Manufacturing employees all have more person-to-person contact than Mr. Witham does as a Corporate employee, and thus there is more of a danger of the Retail and Manufacturing employees to contract and transmit Covid-19. For example, the Retail employees interact with the general public every day, but no mandate was placed upon them.

23. Defendant's Corporate division Vaccine Mandate required its Corporate employees such as Plaintiff "to be fully vaccinated by October 4 [2021]."

24. To avoid termination, Defendant required Plaintiff to receive one of the three vaccines available in the United States: either Johnson & Johnson, Moderna, or Pfizer vaccines.

25. Defendant Hershey did recognize a right of employees to claim a religious exemption to forced vaccination, and Defendant allowed employees to "submit an Accommodation Request on the HR Portal."

26. Defendant thus put itself in the position of deciding the sincerity of the Plaintiff's religious beliefs, and whether his beliefs were "religious" or not.

27. Consistent with Defendants' instructions that employees could request a religious exemption to the Covid-19 Vaccine Mandate, Plaintiff Witham requested a religious accommodation from Defendant Hershey.

28. In his religious accommodation request, Plaintiff Witham stated he is a Roman Catholic, he takes his faith very seriously, and Catholic teaching requires him to reject the vaccine if Plaintiff discerns through his religiously informed conscience that taking the vaccine will violate his religious faith. Plaintiff wrote in the accommodation request "the Roman Catholic Church teaches that a person may be required to refuse a medical intervention, including a vaccination, if his or her informed conscience comes to this sure judgment."

29. Plaintiff Witham cited his reliance on the Catechism of the Catholic Church as the basis for his beliefs. He explained that his religious beliefs are based on the Catechism, which is 688 pages long and comprehensively covers subjects over the course of 2,865 numbered sections.

30. The Catechism of the Catholic Church states, among other things: "Man has the right to act in conscience and in freedom to make moral decisions. He must not be forced to act contrary to his conscience. Nor must he be prevented from acting according to his conscience, especially in religious matters." *Ex. 1, § 1782*.

31. Plaintiff Witham informed Defendant Hershey that a "Catholic may judge it wrong to receive certain vaccines for a variety of reasons consistent with these teachings." *Ex. 2, p. 1*

32. Plaintiff Witham provided much more explanation of his beliefs, as formed by his Catholic faith. He informed Defendant that Catholic teaching is clear on the following matters:

- Vaccination is not morally obligatory in principle and so must be voluntary;
- There is a **general moral duty to refuse** the use of medical products, **including certain vaccines, that are produced using human cells lines derived from direct abortions**;
- A person is morally required to obey his or her own conscious even if it errs.
- A Catholic may judge it wrong to receive certain vaccines for a variety of reasons consistent with these teachings, including therapeutic proportionality which is an assessment of whether the benefits of a medical intervention outweigh the undesirable side effects and burdens in light of the integral good of the person, including spiritual, psychological, and bodily goods."

Ex. 2.

33. Plaintiff Witham informed Defendant that his religious beliefs preclude him from taking the Covid-19 vaccine on the basis that the Covid-19 vaccines available in the U.S. pursuant to the **Emergency Use Authorization** were produced with or tested on "human cells derived from direct abortions." *Ex. 2, p. 1*. He repeated on page 2 that "An individual Catholic may invoke Church teaching to refuse a vaccine developed or produced using abortion-derived cell lines." *Ex. 2, p. 2*.

34. Plaintiff Witham cited Catholic teaching in his explanation, including the Catholic Catechism, documents from the United States Conference of Catholic Bishops, and documents prepared by the Catholic Congregation for the Doctrine of the Faith. These documents are important for Roman Catholics who seek to understand the teachings of the Church on matters such as taking medications, including vaccines.

35. Plaintiff Witham believes that using cells produced with or tested with cells from aborted babies would make him an accessory to the killing of the unborn babies from whom the cells were taken. Even though Plaintiff did not perform the abortion, he believes that if he received the vaccine he would be participating in the abortion by providing a market for the cells, and using the effects from someone else's commission of the abortion. Plaintiff's religious beliefs teach that the recipient of a vaccine manufactured aborted fetal cells makes the recipient a participant in the offensive act – i.e., abortion.

36. In addition, Plaintiff's religious faith teaches that his human body is the temple of the Holy Spirit and, therefore, Plaintiff may not introduce into his body any substance which would harm this "temple." Plaintiff Witham had serious reservations about the "safety" of the vaccines, "side effects," and the "risks" associated with the vaccines and was concerned that injection of the vaccines into his body would harm his body. Defendant acknowledged Plaintiff's concerns over the vaccine safety. However, Defendant castigated Plaintiff's safety concerns as "medical" or "personal views," which Defendant argued are "devoid of any description of sincerely-held religious beliefs."

37. Plaintiff's hesitancy to take the vaccine because of "safety" and "health" and "risk" concerns, *is part of his Catholic belief system*, which is also described in the Catechism.[1]

- "*Human life is sacred* because from its beginning it involves the *creative action of God* …" *See attached as Ex. 1, Catechism § 2258*.
- "*Everyone is responsible for his life* before God who has given it to him. … We are obliged to *accept life gratefully and preserve it for his honor* and the *salvation of our souls*. We are *stewards, not owners, of the life God has entrusted to us*." *Ex. 1, § 2280*.
- "Life and physical health are precious *gifts entrusted to us by God*. We must *take reasonable care* of them …". *Ex. 1, § 2288*.
- "the *virtue of temperance* disposes us to avoid every kind of excess" including "*medicine*." *Ex. 1, § 2290*.
- "*Science and technology* by their very nature require unconditional respect for *fundamental moral criteria*." *Ex. 1, § 2294*.
- "*Experimentation on human beings* is *not morally legitimate* if it exposes the subject's life or physical and psychological integrity to *disproportionate or avoidable risks*. *Experimentation on human beings* does not conform to the *dignity of the person* if it takes place *without the informed consent* of the subject or those who legitimately speak for him." *Ex. 1, § 2295*.[2]

*Exhibit 1 (emphasis added).*

---

[1] Plaintiff cited the Catechism in his request for a religious exemption, and sent portions of it to Defendant. Plaintiff attaches provisions to support his "comprehensive beliefs." *See, Ex. 1*.

[2] The vaccines were all passed as Emergency Use Authorization. Though the Pfizer vaccine was given FDA approval in August 2021, it was not, in at least the first year or so—the applicable period for Plaintiff's consideration—even available in the United States. Thus, Plaintiff's potential receipt of the vaccine would have meant he literally and legally would have taken the vaccine "experimentally," which caused him additional health and medical concerns about taking the vaccines.

38. Plaintiff sought to—as much as was possible given Defendant's limitations on how much Plaintiff could say or write in support of his requests for religious exemptions—convey that in practicing his Catholic faith, he had weighed the "risks" and benefits of taking the vaccine, and according to his religion beliefs, he refused to take the vaccine.

39. Plaintiff attempted to express that his Catholic faith required that he view his life as "sacred" (§ 2258), his "physical health" is a "precious gift entrusted by God" (§ 2288), that he takes seriously his obligation to be "responsible" for his life, to "take reasonable care" for his body, and to "preserve it for his honor." (§§ 2280, 2288). Plaintiff's Catholic faith required that he view taking medicines or vaccines that are unnecessary violates the "virtue of temperance." (§ 2290). Plaintiff's Catholic faith required that he believe that "science and technology" including medicine, require the application of "fundamental moral criteria" (§ 2294), which in the case of the Covid-19 vaccines, requires Plaintiff to reject the Covid-19 vaccines then available. Plaintiff's Catholic faith required that he view the Covid-19 vaccines as "experimentation," and that any alleged benefit to receiving them would be "disproportionately" small to the "risks" associated with taking the vaccines.

40. Plaintiff had factual support for his beliefs. Negative side effects of the Covid-19 vaccines are well known and even warned of in the vaccine literature and CDC "Fact Sheets."[3] The government VAERS system also tracks Covid-19 injuries, illnesses,

---

[3] The risks include: **Pfizer**: severe allergic reaction; rash, itching, hives, or swelling of the face; myocarditis (inflammation of the heart muscle) and pericarditis (inflammation of

and deaths, and has revealed levels of death and injury from Covid vaccines that exceed all other vaccine deaths and injuries from all other vaccines prior to Covid.

41. Plaintiff Witham invited Defendant Hershey to contact Plaintiff's spiritual leader, Fr. Joseph Johnson, to discuss Mr. Witham's religious beliefs, as well as to understand the Catholic teaching Mr. Witham cited. Defendant's assigned employee relations contact for Plaintiff Witham's accommodation request asserted that she would contact Fr. Johnson. However, then Defendant's employee relations representative changed her mind and refused to contact Fr. Johnson. Defendant thus instead chose to remain ignorant of the comprehensive nature of Plaintiff's religious beliefs.

---

the lining outside the heart); injection site pain, tiredness, headache, muscle pain, chills, joint pain, fever, injection site swelling, injection site redness, nausea, feeling unwell, swollen lymph nodes, diarrhea, vomiting, and arm pain have occurred according to Pfizer's Fact Sheet. https.//labeling.pfizer.com/ShowLabeling.aspx?id=14477. (revised 8 December 2022) (last accessed 12/9/22); **Moderna:** "injection site pain, tenderness and swelling of the lymph nodes in the same arm of the injection, swelling (hardness), and redness; fatigue; headache; muscle pain; joint pain; chills; nausea and vomiting; fever; and rash. … Cases of myocarditis and pericarditis have rarely been reported in some people." https://www.cdc.gov/vaccines/covid-19/eui/download/Moderna-Caregive.pdf. (version 9/02/2022) (last accessed 12/9/22). **Johnson & Johnson**: injection site reactions including pain, redness of the skin and swelling; headache, feeling very tired, muscle aches, nausea, and fever; swollen lymph nodes, blood clots; unusual feeling in the skin such as tingling, persistent ringing in the ears (tinnitus); diarrhea, vomiting; severe allergic reaction, including difficulty breathing, swelling of face and throat, fast heartbeat, bad rash, dizziness and weakness; shortness of breath, chest pain, leg swelling, persistent abdominal pain, severe or persistent headaches or blurred vision, easy bruising; thrombosis with thrombocytopenia, Guillain-Barre syndrome. https://www.fda.gov/media/146305/download (revised May 5, 2022) (last accessed 12/9/22).

42. The only vaccines available to Plaintiff Witham during the latter part of 2021 and early part of 2022, were those produced and made available in the United States pursuant to the Emergency Use Authorization.

43. Plaintiff Witham attempted to "engage in dialogue" with Defendant regarding his request for a religious exemption, and Defendant refused to engage in dialogue.

44. Defendant Hershey denied Plaintiff's request for a religious exemption. Plaintiff appealed the denial of his request for a religious exemption, but this did not change Defendant's denial of Plaintiff's request for the religious exemption to taking the vaccine. Defendant Hershey did not provide Plaintiff Witham with the criteria it used in evaluating his request for a religious exemption nor did Defendant Hershey provide specific information regarding the reasons for the denial of Plaintiffs' request for a religious exemption.

45. Plaintiff believes that Defendant recently stopped its application of the Vaccine Mandate against employees and has begun hiring back some of the employees who were terminated because of the Vaccine Mandate.

46. Plaintiff Witham asserted a claim for unemployment compensation following his termination for not receiving the Covid-19 vaccine. The issue in the Minnesota unemployment compensation proceeding was whether Mr. Witham was terminated for "employment misconduct," or alternatively for exercising valid rights, in this case, Mr. Witham's sincerely held religious beliefs. After a full interrogative hearing on April 7, 2022, the Unemployment Law Judge concluded decisively that Mr. Witham's

religious beliefs were firmly held and were sincere. The Unemployment Law Judge held that:

> "Witham has been a Catholic for 29 years and is opposed to abortion for religious reasons. He *sincerely believes* that because the Covid-19 vaccines available in the U.S. were tested or developed using cell lines derived from fetal tissue from an abortion, taking one of those vaccines would be akin to supporting the development or testing of vaccines on such cell lines. Witham believes that when faced with the decision whether to receive a vaccine or medication that has this connection to abortion, *his faith requires him to consider his moral obligations, including looking for alternatives to the vaccine or medication, and considering other moral duties and factors …*".

*Ex. 3, Findings of Fact and Decision, p. 3 (emphasis added).*

> The Unemployment Law Judge continued stating that "Witham submitted a request for a religious accommodation, *explaining in detail his religious beliefs and reasoning*." *Ex. 3, p. 3*. And "Witham declined to get the vaccine, but he did so *based on sincerely held religious beliefs*. *Witham's testimony about his religious beliefs against abortion and about his deliberation and decision-making process about vaccination was candid, uncontrived, firm, and credible*." *Ex. 3, p. 4 (emphasis added)*.

47. Defendant Hershey was a party to that Unemployment Compensation proceeding, and had an interest in opposing Plaintiff Witham's claim that he refused to take the vaccine because of his sincerely held religious beliefs.

48. Defendant made no attempt to determine if Plaintiff's beliefs were sincerely held, were part of his comprehensive belief system, and did not attempt to determine whether Plaintiff Witham pondered the "fundamental and ultimate questions." Defendant made no attempt to determine if Plaintiff's religious beliefs related to the "deep matters" of life, whether he had a belief in a deity, soul, or his beliefs related to the "afterlife," or whether his beliefs were part of a "comprehensive" set of beliefs.

49. Defendant Hershey did not contact Plaintiff's spiritual leader to evaluate his religious objection. Defendant Hershey did not engage in any "interactive process" to evaluate his religious beliefs, or his moral objections to the Covid-19 vaccines.

50. Had Defendant Hershey made any of these inquiries, it would have discovered that Plaintiff Witham takes his faith very seriously. He goes to Mass at least once per week; goes to reconciliation/confession regularly; prays the rosary and makes other prayer daily. Defendant would also have found out—as did the Unemployment Law Judge during that hearing—that Plaintiff Witham is faithful to the Catholic Church's teaching on abortion. Plaintiff's religious beliefs are sincerely, firmly, and consistently held. Plaintiff's religious beliefs inform all of his decision-making in life.

51. Further, Hershey did not consider a reasonable accommodation to Plaintiff's employment. In fact, no accommodation was even necessary because Plaintiff Witham had been safely performing the job under safety protocols already in place at Hershey – working remotely at Plaintiff's home. Plaintiff had done so well at his job working remotely that he received a promotion in the middle of the pandemic—in June 2021.

52. Defendant Hershey made no attempt to prove that Plaintiff Witham was a danger to any other customers or employees. There is no evidence that Plaintiff Witham ever transmitted Covid-19 to any co-workers or customers.

53. Most importantly, prior to Plaintiff's termination, Plaintiff had contracted Covid-19 and recovered. Therefore, Plaintiff had natural immunity to Covid-19 and there was no need for him to be vaccinated. Defendant Hershey made no attempt to evaluate

the effectiveness of Plaintiff Witham's acquired natural immunity, obtained through infection and recovery.

54. Plaintiff Witham received positive job performance reviews for his work for Defendant, and his most recent (2020) performance was ranked as either "successful" or "very successful" according to all of Defendant's metrics. Because of this, he received the promotion to Omnichannel Integration Lead in June 2021.

55. Plaintiff knows of people who received the Covid-19 vaccine and then shortly thereafter suffered from illnesses.

56. Plaintiff Witham proposed reasonable accommodations to Defendant such as periodic testing, self-monitoring, and use of PPE. Defendant did not respond to Plaintiff's requests.

57. Rather than being an interactive process, Defendant Hershey summarily denied the requests for religious exemptions with boilerplate language which stated that:

> "We cannot provide a requested accommodation when it would create an undue hardship. One of the ways that a request can pose an undue hardship is when the proposed accommodation poses a health risk to the individual or others. With respect to your specific request—to not get vaccinated and still perform or be required to perform in-person work we have concluded that there is no accommodation available that would enable you to continue to perform the essential functions of your job without imposing undue hardship or risking the business partners, other individuals working on or visiting our premises, and members of the public. This is particularly true as your role requires you to work in close contact with other individuals."

58. Defendant Hershey terminated Plaintiff Witham on January 21, 2022. Plaintiff Witham filed a claim for religious discrimination with the EEOC, and the EEOC issued Plaintiff Witham a Right to Sue letter dated March 6, 2023.

59. Defendant replaced Plaintiff Witham with an employee who did not have sincerely held religious beliefs that resulted in an objection to receiving the Covid-19 vaccine.

60. Plaintiff Witham was treated differently than other employees of Defendant Hershey because of Plaintiff Witham's sincerely held religious beliefs.

61. Another Corporate employee, who was female, was allowed by Defendant Hershey to maintain employment during the Vaccine Mandate despite not being vaccinated. This employee was allowed to remain on payroll as a contractor and then once the Vaccine Mandate was lifted, she was hired back as an employee on a full-time basis. This option was not offered to Plaintiff.

62. Prior to Plaintiff's termination, Defendant had demonstrated additional discrimination against Plaintiff. For example, The Hershey Corporate Communication Director stated at a Senior Leaders Meeting in 2020 that Hershey had decided to change its culture and that part of that change would address that Hershey had "*too many old white guys*" working there. The Corporate Communications Director who made that statement is a *Director* of the Defendant Hershey Corporate Department.

63. The statement, "too many old white guys," is direct proof of age ("old"), race ("white"), and sex ("guys") discrimination.

64. Further, following the Senior Leaders Meeting at which the above policy was articulated, Defendant Hershey announced that its survey included a quote that the opinions of the "old, white guy" demographic should not be considered as the company sought to diversify its employee base.

65. Defendant Hershey has confirmed and admitted that the "Senior Leaders Meeting" at which the above statement was made did take place, and that "diversity, equity and inclusion has been a topic" at this and other Leader Forums. Thus, Hershey has admitted the *background*, the *forum*, the *subject,* and the *timing* of the statement.

66. Defendant replaced Plaintiff Witham with an employee who was significantly younger, a different race, and/or female so as to meet Defendant's DEI goals and quotas.

67. Plaintiff Witham was treated less favorably than other employees of Defendant Hershey because of Plaintiff Witham's race, sex, and age of 52 at the time of his termination.

68. Plaintiff Witham also filed a claim for age, sex, and race discrimination with the EEOC, and the EEOC issued Plaintiff Witham a Right to Sue letter for those claims dated March 6, 2023.

69. As a result of Defendant's policy on restricting religious exemptions, very few people qualified for those exemptions, resulting in mass terminations for those, including Plaintiff, who refused to be injected with the Covid-19 vaccine and whom Defendant terminated as a result.

70. Defendant granted a small number of religious exemptions to very high-ranking employees whose high rank allowed them to influence Defendant's religious exemption process.

71. Defendant conducted little case-by-case analysis or individualized interactive process to discuss Plaintiff's religious exemption request or possible accommodation of his religious objection.

72. Defendant did not provide information to its employees, including the Plaintiff, about how Defendant determined whether the religious beliefs of those employees who submitted requests for a religious exemption to taking the Covid-19 vaccine were sincerely held or whether those religious beliefs would be accommodated.

73. Plaintiff submitted a good-faith statement of his sincerely-held religious beliefs, with explanations of how his faith constrained him from accepting the Covid-19 vaccination. Defendant's exemption review team nevertheless denied the Plaintiff's request for a religious exemption and Defendant made no effort to accommodate his request for a religious exemption.

74. Defendant, in issuing the Vaccine Mandate, instructed that all of its employees must be "fully vaccinated." The phrase "fully vaccinated" related to Covid-19 vaccinations, has changed from one shot, to two shots, then three shots, then four shots, and even a discussion of a fifth shot or annual shots.

75. Defendant issued the Vaccine Mandate mandating only its Corporate department employees, including Plaintiff, take the Covid-19 vaccine despite existing evidence that the Covid-19 vaccine did not prevent infection or transmission, did not provide protection as long lasting as had been represented, but only allegedly reduced the severity of Covid-19 if a person contracts Covid-19.

76. On August 6, 2021, CDC Director Dr. Rochelle Walensky stated that vaccines against Covid-19 did not prevent transmission of SARS-CoV-2 variants (Virus).[4] This followed the CDC's updated guidance and Dr. Walensky's comments on July 27, 2021, recommending that everyone wear a mask in indoor public settings in areas of substantial and high transmission, regardless of vaccination status. This decision was made based on data published in CDC's *Morbidity and Mortality Weekly Report (MMWR)*, demonstrating that SARS-CoV-2 infection resulted in similarly high SARS-CoV-2 viral loads in both vaccinated and unvaccinated people. High viral loads in both vaccinated and unvaccinated demonstrated that being vaccinated had no impact on whether those vaccinated could transmit the virus to others. "[5]

77. Dr. Deborah Birx, the former White House Covid Response Coordinator, stated in July 2022: "*I knew these vaccines were not going to protect against infection. And I think we overplayed the vaccines* …". Separately Dr. Birx also stated: "*When we make broad statements, when we say to people that these vaccines are going to protect against infection – one, it wasn't studied*, …".

78. Government regulations contained in, for example, the Centers for Medicare and Medicaid Services ("CMS") also recognized in the text of medical

[4] https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html. (last accessed November 8, 2022).

[5] *Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR*, Centers for Disease Control and Prevention (July 30, 2021), https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html (emphasis added). See also, https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html. (last accessed November 8, 2022); https://www.cdc.gov/media/releases/2022/p0811-covid-guidance.html. (last accessed November 8, 2022).

regulations that it was not even known if the vaccines worked, which the CDC and Dr. Birx also acknowledged as set forth above. *See, 86 Fed. Reg. at 61615 (Nov. 5, 2021)* (acknowledging that "*the duration of vaccine effectiveness in preventing Covid-19, reducing disease severity, reducing the risk of death, and the effectiveness of the vaccine to prevent disease transmission by those vaccinated <u>are not currently known</u>.*" (emphasis added).

79. These uncertainties and doubts are repeated throughout the CMS regulations:

- "Like most vaccines, **COVID-19 vaccines are not 100 percent effective in preventing COVID-19. Consequently, some "breakthrough" cases are expected** and, as the number of people who have completed a primary vaccination series and are considered fully vaccinated for COVID-19 increases, breakthrough COVID-19 cases will also increase commensurately." 61565 (emphasis added).

- **"There are also <u>several unknowns</u> that may affect current progress or this rule or both. These include the duration of strong vaccine protection with or without a booster shot and the possibility of new virus variants that reduce the effectiveness of currently authorized and approved vaccines. We <u>cannot estimate</u> the effects of each of the possible interactions among them, but throughout the analysis we point out some of the most important <u>assumptions</u> we have made and the possible effects of <u>alternatives to those assumptions.</u>"** 61603 (emphasis added).

- **"There are <u>major uncertainties in these estimates</u>.** One obvious example is **<u>whether vaccine efficacy will last</u> more than the approximately 1 year proven to date and whether boosters are needed.[FN244] Some in the scientific community believe that "booster" vaccinations after 6 or 8 months would be desirable to maintain a high level of protection against the predominant Delta version of the virus. <u>Delta may be overtaken</u> by other virus mutations, <u>which creates another uncertainty</u>. Booster vaccination or use of vaccines whose licenses or EUAs have been amended to address new variants would likely maintain the**

**effectiveness of vaccination for residents and staff."** 61609 (emphasis added).

- "All these data and estimation limitations apply to even the short-term impacts of this rule, and **major uncertainties remain as to the future course of the pandemic, including but not limited to vaccine effectiveness in preventing "breakthrough" disease transmission from those vaccinated, the long-term effectiveness of vaccination, the emergence of treatment options, and the potential for some new disease variant even more dangerous than Delta."** 61612 (emphasis added).

- "As explained in various places within this RIA and the preamble as a whole, **there are major uncertainties as to the effects of current variants of SARS-CoV-2 on future infection rates, medical costs, and prevention of major illness or mortality**. … T**hese uncertainties also impinge on benefits estimates."** 61615 (emphasis added).

80. Vaccination does not prevent infection or transmission of Covid-19, and Defendant's Vaccine Mandate did not support Defendant's claimed policy of keeping its clients and employees safe. For many months, the CDC has no longer differentiated between vaccinated and unvaccinated individuals.[6]

81. Dr. Deborah Birx stated "[*b]ut let's be very clear: 50% of the people who died from the Omicron surge were older, vaccinated*."

82. The VAERS system has documented that the vaccines themselves have numerous harmful side effects associated with them. Some of these harmful side effects are included in the lists of side effects described right on the vaccine literature, and warned about in "Fact Sheets" on the CDC website.

---

[6] https://www.cdc.gov/media/releases/2022/p0811-covid-guidance.html. (last accessed November 8, 2022).

83. Thus, the extent of Covid-19 infections, the severity of the Covid-19 infection, the efficacy of the vaccines, and the time-length of vaccine protection may all have been overstated, contributing to an over exuberance in mandating vaccines, and punishing the unvaccinated, as Defendant has done as set forth above.

84. The State of Minnesota ceased to be under a state-declared "emergency" before Defendant instituted its Vaccine Mandate, as Governor Timothy Walz officially ended the State's emergency effective June 30, 2021.

85. Defendant Hershey pledged to "*not make any employment related decisions based upon a person's race, color, gender, national origin, age, religion, citizenship status, disability, medical condition, sexual orientation, gender identity, veteran status, marital status, or any other basis protected by law*."

86. Defendant Hershey stated that its anti-discrimination policies apply to "*all discrimination and harassment that occurs in the work environment, including areas not only on Company property, but also areas outside of company property*" where employees perform work and "*locations where employees attend Company related meetings*" such as Leader meetings.

87. Defendant's policy acknowledged that "*workplace harassment can take many forms including...spoken…remarks,*" and accordingly Defendant's written policy prohibited itself from discriminating via spoken remarks.

88. Mr. Witham was terminated just shortly before almost $144,000 of gross income from RSUs/stock options would have vested in the February and March 2022 time-frame. Additionally, he was terminated just shortly before another expected

~$80,000 of bonus pay (estimate based on company performance and prior year payout), would have been due if he had been retained through March 8, 2022.

89. Altogether, with the amounts from ¶88, along with lost compensation and other long term incentive compensation including stock options and RSUs that were in the process of vesting. Defendant denied Plaintiff approximately $1,000,000.00 in total compensation by discriminating against Plaintiff and terminating him for not receiving a vaccine shown not to be efficacious and of questionable quality.

90. Hershey terminated Mr. Witham because of the motivating factors of his religion, his age, his sex (male), his race, his relative high compensation, and his chronological proximity to fully vesting in benefits, and ultimately retiring with his benefits.

91. After terminating Plaintiff Witham, Defendant Hershey has ended its Vaccine Mandate.

**FIRST CAUSE OF ACTION**

**Religious Discrimination and Failure to Accommodate under Title VII of the Civil Rights Act of 1964**

92. Plaintiff restates and realleges all previous allegations as if fully set-forth herein.

93. Defendant Hershey is an “employer” within the meaning of 42 U.S.C. § 2000e(b).

94. Plaintiff is an “employee” within the meaning of 42 U.S.C. § 2000e(f).

95. Plaintiff has sincerely held religious beliefs that prevented him from receiving the vaccine. Plaintiff's beliefs arise because of his sincerely held religious beliefs.

96. Plaintiff informed the Defendant of the conflict between Plaintiff's religious beliefs and taking the vaccine.

97. Plaintiff has a sincerely held religious belief which makes him a member of a protected class.

98. Plaintiff was qualified for the job position which he held prior to being terminated.

99. Title VII of the Civil Rights Act prohibits discrimination on the basis of religion. *Id*. § 2000e-2. The Act further requires covered employers to provide reasonable accommodation to their employees' sincerely held religious beliefs. *Id*. § 2000e(j).

100. The Act prohibits Defendant from scrutinizing what the Defendant believes to be the sincerity of Plaintiff's religious beliefs, or whether Plaintiff's exercise of his beliefs is logical or as consistent as Defendant believes the exercise of those religious beliefs should be.

101. Guidance issued by the Equal Employment Opportunity Commission and decisions of the federal courts require that requests for reasonable accommodation be considered based on their individual, particularized circumstances, and that any claim of undue hardship or "direct threat" by the employer be assessed on a case-by-case basis rather than through application of a blanket rule.

102. Plaintiff, in his request for accommodation from Defendant's Vaccine Mandate, made an individualized request for accommodation, but instead was terminated.

103. In response to Plaintiff's request for reasonable accommodation of his sincerely-held religious beliefs, Defendant and its exemption review team applied a uniform, blanket rule in rejecting Plaintiff's requests, in violation of both Title VII and the EEOC's persuasive guidance on reasonable accommodation.

104. Plaintiff was replaced by a non-member of a protected class.

105. Plaintiff's religious beliefs were a motivating factor in Defendant's decision to terminate Plaintiff.

106. Despite the Plaintiff's consistent requests for Defendant to engage in an interactive process regarding his request for accommodation, Defendant refused throughout to engage in the interactive process and instead rejected Plaintiff's requests for an exemption for identical reasons as other of the Defendant's employees using an identical form letter.

107. Defendant could have accommodated Plaintiff's requests for a religious exemption without suffering any undue hardship by having him continue to work remotely, as he had done prior to his termination, and as he had done at Defendant's request. Defendant further refused to continue to employ Plaintiff subject to reasonable accommodations that Plaintiff requested.

108. Defendant discriminated against Plaintiffs on the basis of Plaintiff's sincerely held religious beliefs, by refusing to consider Plaintiff's religious beliefs, by

disagreeing with Plaintiff's religious beliefs, by terminating him, and by replacing him with an employee who had no religious beliefs, or beliefs which were not deeply held.

109. Defendant's actions constitute discrimination on the basis of religion and failure to accommodate, all in violation of 42 U.S.C. §§ 2000(e)-2 and 2000(e)(j).

110. Because of Defendant's unlawful actions, Plaintiff suffered and continues to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorney fees in excess of $75,000.

**SECOND CAUSE OF ACTION**

**State law religious discrimination claim under MHRA, Minn. Stat. §363A.08**

111. Plaintiff restates and realleges all previous allegations as if fully set-forth herein.

112. Minn. Stat. Sec. §363A.01, et seq. prohibits discrimination in employment based on religion.

113. Defendant is an "employer" within the meaning of Minn. Stat. §363A.01.

114. Plaintiff is an "employee" within the meaning of Minn. Stat. §363A.01.

115. Plaintiff has sincerely held religious beliefs which prevented him from receiving the Covid-19 vaccine.

116. Plaintiff informed the Defendant employer of the conflict between his religious beliefs and receiving the vaccine.

117. Minn. Stat. §363A.01 et seq. prohibits discrimination on the basis of religion and further requires covered employers to respect its employees' sincerely held religious beliefs.

118. Minn. Stat. §363A.01 et seq. prohibits Defendant from scrutinizing what it believes to be the sincerity of Plaintiff's religious beliefs, or whether Plaintiff's exercise of his beliefs is logical or as consistent as Defendant believes the exercise of those religious beliefs should be.

119. In response to the Plaintiff's requests for reasonable accommodation of his sincerely-held religious beliefs, Defendant's exemption review team applied a uniform, blanket rule in rejecting nearly all, in violation of the law.

120. Despite Plaintiff's requests for Defendant employer to engage in dialogue regarding his requests for a religious exemption, the Defendant refused throughout to engage in the interactive process, and instead Defendant terminated Plaintiff for generalized reasons, using identical form letters.

121. Defendants' actions constitute discrimination on the basis of religion in violation of Minn. Stat. §363A.01 et seq.

122. Because of Defendant's unlawful actions, Plaintiff has suffered and continues to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorney fees in excess of $75,000.

## THIRD CAUSE OF ACTION

### Discrimination and Failure to Accommodate under the ADA, 42 U.S.C. § 12101 *et seq.*

123. Plaintiff restates and realleges all previous allegations as if fully set-forth herein.

124. Defendant Hershey is an "employer" within the meaning of 42 U.S.C. § 12111(5)(A).

125. Plaintiff was an "employee" of the Defendant employer within the meaning of 42 U.S.C. § 12111(4).

126. The ADA, at 42 U.S.C. § 12112 (d)(4)(a), prohibits employers from requiring current employees to undergo medical examinations or inquiries unless it is job related and consistent with business necessity.

127. Defendant's Vaccine Mandate violated 42 U.S.C. § 12112 (d)(4)(a), by initially requiring testing, vaccination, and then by simply terminating the Plaintiff. Defendant's Vaccine Mandate policy was neither job related nor consistent with business necessity. Since the Covid-19 vaccine did not prevent infection or transmission of Covid-19 by the vaccinated, particularly the dominant Delta and Omicron variants at the time of Plaintiff's termination, the discrimination between the vaccinated and unvaccinated violated the ADA.

128. As a result of Defendant's actions in violation of the ADA, Plaintiff suffered and continues to suffer economic and other damages in amounts to be proven at

trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorney fees in excess of $75,000.

**FOURTH CAUSE OF ACTION**

**Disparate Treatment--Age Discrimination under the ADEA**

129. Plaintiff restates and realleges all previous allegations as if fully set-forth herein.

130. Defendant Hershey is an "employer" within the meaning of 29 U.S.C. §621 *et seq*.

131. Plaintiff Witham was an "employee" within the meaning of 29 U.S.C. §621 *et seq*.

132. Mr. Witham was over the age of 40 at the time of his termination, and is therefore a member of a protected class for an age discrimination claim.

133. Plaintiff Witham was qualified to perform his job, and had done so for years, even receiving a recent promotion during the Pandemic, and shortly before he was terminated.

134. Plaintiff's age was a motivating factor for his termination.

135. Plaintiff Witham suffered an adverse employment action, being terminated, because of his age.

136. The statements he has alleged, along with the fact that he was terminated despite being proficient and even excellent at his job, establish Plaintiff's age was a motivating factor in the decision to terminate him.

137. Under the ADEA, 29 U.S.C. §621 *et seq*., it is unlawful for an employer to, *inter alia*, discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age.

138. Defendant has discriminated against Plaintiff by terminating him because of his age.

139. As a direct and proximate result of Defendant's actions in violation of the ADEA, Plaintiff suffered and continues to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorney fees in excess of $75,000.

## FIFTH CAUSE OF ACTION

### Race Discrimination under Title VII of the Civil Rights Act of 1964

140. Plaintiff restates and realleges all previous allegations as if fully set-forth herein.

141. Defendant Hershey is an "employer" within the meaning of 42 U.S.C. § 2000e, et seq.

142. Plaintiff is an "employee" within the meaning of 42 U.S.C. § 2000e, et seq.

143. Title VII prohibits employers from discriminating against employees based on their race.

144. Plaintiff Witham presents direct evidence of race discrimination through the statements he has alleged. Defendant Hershey's statement that the Corporate

Department had "too many old white guys," is direct proof of race ("white") discrimination.

145. The statement was made by a Corporate Communications director, confident that such blatant discrimination was tolerable in the age of DEI: diversity, equity and inclusion. However, it is also direct proof of illegal discrimination on the basis of race.

146. Mr. Witham also suffered an adverse employment action, termination.

147. Plaintiff Witham's race was a motivating factor in his termination.

148. Had Plaintiff been of a minority race, he would not have been terminated.

149. As a result of Defendant's actions in violation of Title VII, Plaintiff suffered and continues to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorney fees in excess of $75,000.

**SIXTH CAUSE OF ACTION**

**Sex Discrimination under Title VII of the Civil Rights Act of 1964**

150. Plaintiff restates and realleges all previous allegations as if fully set-forth herein.

151. Defendant Hershey is an "employer" within the meaning of 42 U.S.C. § 2000e, et seq.

152. Plaintiff is an "employee" within the meaning of 42 U.S.C. § 2000e, et seq.

153. Title VII prohibits employers from discriminating against employees based on their sex.

154. Plaintiff Witham presents direct evidence of sex discrimination through the statements he has alleged. Defendant Hershey's statement that the Corporate Department had "too many old white guys," is direct proof of sex ("guys") discrimination, because Plaintiff is a male.

155. Plaintiff Witham's sex was a motivating factor in his termination.

156. Had Plaintiff been a woman, he would not have been terminated.

157. The statement was made by a Corporate Communications director, confident that such blatant discrimination was tolerable in the age of DEI: diversity, equity and inclusion.

158. Mr. Witham also suffered an adverse employment action, termination.

159. As a result of Defendant's actions in violation of Title VII, Plaintiff suffered and continues to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorney fees in excess of $75,000.

## SEVENTH CAUSE OF ACTION

### Breach of Contract

160. Plaintiff restates and realleges all previous allegations as if fully set-forth herein.

161. Defendant Hershey pledged to "not make any employment related decisions based upon a person's race, color, gender, national origin, age, religion, citizenship status, disability, medical condition, sexual orientation, gender identity, veteran status, marital status, or any other basis protected by law."

162. Defendant Hershey's anti-discrimination policies apply to "all discrimination and harassment that occurs in the work environment, including areas not only on Company property, but also areas outside of company property" where employees perform work and "locations where employees attend Company related meetings" such as Leader meetings.

163. Defendant's policy acknowledged that "workplace harassment can take many forms including...spoken…remarks."

164. Defendant's policies and representations created contractual terms.

165. Defendant breached the terms of the contract.

166. As a result of Defendant's actions in breach of the contract, Plaintiff suffered and continues to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorney fees in excess of $75,000.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims and issues for which he has a right to trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff above-named prays for judgment in his favor and against Defendant for an Order of the Court as follows:

1. Adjudging that Defendant is liable to employee Plaintiff for his actual damages in an amount to be proven at trial, including front pay, back pay, treble damages

and statutory penalty, interest, emotional distress and pain and suffering, compensatory damages, punitive damages, and any damages or penalties available at law;

2. Enjoining Defendant from taking further illegal action against Plaintiff in violation of both state and federal law, and Ordering Defendant to take action to restore Plaintiff to his position he would have enjoyed absent Defendant's illegal conduct;

3. Awarding Plaintiff's costs, reasonable attorney fees, prejudgment interest, and any other relief permitted by statute; and

4. Awarding such other relief as the Court may deem just and equitable, including, without limitation, an injunction prohibiting differences in treatment between the vaccinated and unvaccinated which do not have a scientific basis.

Dated: May 26, 2023

*s/William F. Mohrman*
William F. Mohrman, 168816
Vincent J. Fahnlander, 19220X
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, Minnesota 55402
Telephone: 612-341-1074
Email: mohrman@mklaw.com
Email: fahnlander@mklaw.com
*Attorneys for Plaintiffs*